ORDERED.

Dated: **February 17, 2021**

Caryl E. Delano
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Case No. 2:18-bk-05576-FMD |
| | Chapter 7 |
| Linda F. Polasky, | |
|     Debtor. | |
| _____/ | |
| Feldy Boys, LLC, | |
|     Plaintiff, | |
| vs. | Adv. Pro. No. 2:18-ap-594-FMD |
| Linda F. Polasky, | |
|     Defendant. | |
| _____/ | |

**FINDINGS OF FACT,
<u>CONCLUSIONS OF LAW, AND MEMORANDUM OPINION</u>**

THIS PROCEEDING came before the Court for trial on October 20, 2020 and October 23, 2020, of the *Complaint Objecting to Dischargeability of Debt Owed by Debtor* (the

"Complaint")[1] filed by Feldy Boys, LLC ("Plaintiff"). Plaintiff alleges that Debtor and her husband fraudulently induced Plaintiff to purchase their commercial real property in Ohio by making material misrepresentations related to the property. Based on these allegations, Plaintiff seeks to except a debt from discharge under 11 U.S.C. § 523(a)(2).

The Court has carefully considered the evidence and finds that Plaintiff did not establish the required elements for nondischargeability of the debt under § 523(a)(2). Judgment will be entered in favor of Debtor on Plaintiff's Complaint.

A.   **Background**

In the 1980's, Debtor formed a corporation, Linda Cooper's Identity Hair Salon, Inc., which conducted business under the name "Identity Hair Salon and Medical Spa" ("Identity"). Debtor was Identity's sole owner and officer. For over 20 years, Debtor operated Identity at 8501 Beechmont Avenue, Cincinnati, Ohio (the "Property"),[2] a commercial property she originally owned with her former husband. Identity also operated a second salon on Kenwood Avenue (the "Kenwood Salon"), approximately ten miles away from the Property.[3]

In 2005, Debtor met John Polasky, her current husband ("Husband"), and they were married in 2006.[4] Husband has been a practicing attorney for over 30 years.[5]

Beginning in November 2005, Husband made a series of loans to Identity that he documented with promissory notes.[6] The promissory notes included a $300,000.00 note dated December 31, 2005,

---

[1] Doc. No. 1. The Complaint originally included an objection to Debtor's discharge under 11 U.S.C. § 727(a)(4), but Plaintiff withdrew the objection to discharge at the outset of trial on October 20, 2020 (Doc. No. 65, Transcript of October 20, 2020 trial, pp. 9-10).
[2] Tr. I, pp. 37-38. The transcript of the first day of trial, on October 20, 2020, is at Doc. No. 65, and the transcript of the second day of trial, on October 23, 2020, is at Doc. No. 66. In this Opinion, the transcripts will be referred to as Tr. I and Tr. II, respectively.
[3] Tr. I, pp. 38-39; Tr. II, p. 30.
[4] Tr. I, p. 39.
[5] Tr. I, pp. 166, 171.
[6] Doc. No. 58-9.

2

and a $405,100.00 note dated January 3, 2006. Husband made these loans to satisfy debts owed by Debtor or Identity, including a payment to Debtor's former husband to buy out his ownership interest in the Property. To secure the loans, Husband obtained a mortgage lien on the Property.[7]

In 2005, Husband prepared a Business Property Lease Agreement (the "Lease") that Debtor signed on Identity's behalf.[8] Under the Lease, Debtor leased the Property to Identity for a 20-year term beginning on January 1, 2006, and Identity agreed to pay Debtor rent of $7,000.00 per month. The Lease was a "triple-net" lease, meaning that Identity was responsible for paying the expenses associated with the Property, such as utilities, insurance, and property taxes.[9]

In August 2010, Husband made three loans to Identity in the amounts of $36,000.00, $18,000.00, and $100,000.00, respectively. Debtor, as Identity's president, signed three promissory notes evidencing these loans.[10] In 2013 or 2014, Husband became a co-owner of the Property.[11] In July 2015, Husband loaned Identity $34,000.00, and Debtor, as president of Identity, signed a promissory note payable to herself and Husband.[12]

Debtor and Husband filed joint federal income tax returns for 2015 and 2016. Their 2015 tax return reflected a nonpassive loss from Identity (an S corporation) of $125,552.00 and net rental income from the Property of $115,831.00.[13] Their 2016 tax return reflected a nonpassive loss from Identity of $179,380.00, and net rental income from the Property of $109,465.00.[14] In October 2016,

---

[7] Doc. Nos. 58-9, 58-12; Tr. I, pp. 47-48, 173-75.
[8] Doc. No. 58-1; Tr. I, pp. 172-73.
[9] Tr. I, p. 173.
[10] Doc. No. 58-9, pp. 5-7. The $36,000.00 note was payable to Husband and Debtor.
[11] Tr. I, p. 183.
[12] Doc. No. 58-9, p. 8.
[13] Doc. No. 58-37, pp. 11-12.
[14] Doc. No. 58-38, pp. 10-11.

Husband loaned Identity $40,000.00, and Debtor, on behalf of Identity, signed a promissory note payable to Husband in that amount.[15]

In late 2016 or early 2017, Debtor and Husband decided to sell the Property, in part because Northside Bank was pressuring Debtor regarding a $200,000.00 line of credit to Identity.[16] In addition, Husband testified that in December 2016, he and Debtor agreed to abate the rent owed to them by Identity because of the pressure from Northside Bank.[17] Debtor and Husband also decided to close the Kenwood Salon and to move its equipment to the Property.

Debtor and Husband employed Nat Comisar ("Comisar") as their real estate agent in connection with the sale of the Property.[18] Comisar marketed the Property as a commercial property having a ten-year lease with Identity.[19]

In March 2017, Debtor, as Identity's president, signed a promissory note in which Identity agreed to pay her $75,000.00.[20] Husband testified that the $75,000.00 amount corresponded to loans that Identity had obtained from two lenders known as Swift Capital and Best Egg.[21] On June 15, 2017, Husband paid the real estate tax due on the Property with a cashier's check for $13,645.41.[22]

On June 26, 2017, Husband wrote Comisar an email regarding a potential sale of the Property, stating that:

> The Mortgage balance on the [Property] is $450,000. . . .The other $300,000 lien on the [Property] is as indicated [Husband]. So guess why he wants to sell????

---

[15] Doc. No. 58-9, p. 9.
[16] Tr. I, pp. 63, 189-90.
[17] Tr. I, p. 223. In a list of Identity's debts as of April 11, 2018, Identity's unpaid rent for 2017 equals $150,000.00 (Doc. No. 58-32).
[18] *See* Doc. No. 58-6.
[19] Doc. No. 67-2, p. 41; Tr. II, pp. 16-17.
[20] Doc. No. 58-9, p. 10.
[21] Tr. I, pp. 181-82.
[22] Doc. Nos. 58-10, 58-11.

4

> . . . [Debtor's] own liquid assets are probably only $100,000. . . . Identity has paid [Debtor] between $130,000 and $160,000 per year for as long as we have been married.[23]

Debtor and Husband filed a joint federal income tax return for 2017, that reflected a nonpassive loss from Identity of $91,119.00 and a net rental loss from the Property of $41,280.00.[24]

In the summer of 2017, Plaintiff became interested in purchasing the Property as an investment. Plaintiff is an Ohio limited liability company, owned by three brothers, that invests in residential and commercial real estate that it intends to hold and lease over a period of time.[25] Plaintiff's president and managing partner, Dan Feldkamp ("Mr. Feldkamp"), was familiar with the Property because it is only a mile or two from Plaintiff's main office, he knew friends and family members who had frequented the Identity salon, and because, in 2000, Plaintiff had considered purchasing the Property for its own office.[26]

Plaintiff's real estate agent was Jack Vilardo ("Vilardo"). On August 8, 2017, Comisar sent Vilardo an email with copies of (1) the Lease, with a representation that Debtor would "execute a new lease upon closing for 10 years at $85,000 NNN with a 2 year personal guarantee and a 10 year corporate guarantee," and (2) Identity's profit and loss statements ("P&Ls") for 2014, 2015, and 2016.[27] The P&Ls apparently were prepared by Identity's internal bookkeeper, Shauna Buckley.[28]

The 2014 P&L reflects that Identity earned total income of $1,824,288.63 and net income of $210,135.47; the 2015 P&L shows that Identity earned total income of $1,779,928.60 and net income of $193,309.01; and the 2016 P&L shows that Identity earned total income of $1,685,134.94 and net income of $117,457.24. The P&Ls also reflect that Identity paid annual rent of $85,000.00 in 2014,

---

[23] Doc. No. 58-12.
[24] Doc. No. 58-39, pp. 9-10.
[25] Tr. II, pp. 13-15.
[26] Tr. II, pp. 15-16.
[27] Doc. No. 58-13.
[28] See Tr. I, p. 106; Doc. No. 67-2, pp. 21, 72-73.

2015, and 2016. The P&Ls do not reflect that Identity made any interest payments on loans or other debt.

On August 17, 2017, Vilardo emailed Comisar regarding "some concern for the risk of default particularly given the fact that the business will likely sell or be transferred."[29] And Mr. Feldkamp testified that he and Vilardo discussed "the fact that [Debtor] had planned to sell off her business at some point."[30]

On August 24, 2017, Vilardo sent Comisar an email stating that Plaintiff had several questions regarding Identity. First, Vilardo asked for the reason why Identity's income had decreased over the prior three years; second, Vilardo asked whether "gift certificates that need to be redeemed" are in Identity's "financials;" and third, Vilardo asked about Debtor's plans and permits for the relocation of equipment from the Kenwood Salon to the Property.[31]

Later that day, Comisar responded to Vilardo:

They [Debtor and Husband] said:

"Question 1. We had two designers with over 20 years with us retire. Any remaining sales loss is due to increased competition and mainly from Booth Rental. We have responded with new talent development and medical spa.

All gift certificates are in the financials.[32]

There are no permits required to move a location. The plan is to move all Laser's and all Medical equipment, product ect. [sic] to [the Property] which will be completed by this Monday."[33]

---

[29] Doc. No. 67-2, p. 71.
[30] Tr. II, p. 84.
[31] Doc. No. 58-19.
[32] The P&Ls were the only "financials" that Debtor provided to Plaintiff. Generally, gift cards or gift certificates are initially recorded as liabilities, and then recorded as sales (income) when they are used by the holders of the gift cards. https://www.accountingtools.com/articles/2017/5/17/accounting-for-gift-cards-gift-certificates?rq=gift%20certificates.
[33] Doc. No. 58-19.

On September 4, 2017, notwithstanding Plaintiff's concerns regarding the absence of a liability for unused gift certificates on Identity's P&Ls, Identity's declining income in the prior three years, and the possibility that Debtor would sell Identity, Plaintiff entered into a contract with Debtor and Husband for the purchase of the Property for $900,000.00 (the "Contract").[34] The Contract was conditioned on Identity's entering a new lease agreement with Plaintiff, to be guaranteed by Debtor for four years. In the Contract, Plaintiff represented that it was relying solely on its own examination of the Property as to the Property's physical condition and character, and not on any statements by the real estate agents, except for the agents' written statements made directly to Plaintiff.[35]

The sale closed on October 30, 2017 (the "Closing Date"). The closing statement reflects that Plaintiff paid the purchase price of $900,000.00, and that three mortgages totaling $810,824.63 were paid at closing, including a portion of Husband's third mortgage on the Property.[36] Debtor, as president of Identity, signed a new lease agreement (the "New Lease") with Plaintiff as the landlord, and Debtor individually signed a personal guaranty of Identity's obligations under the New Lease.[37] At the closing, Husband paid the first and last months' rent to Plaintiff under the New Lease with a check written on the bank account of his separately owned corporation.[38]

On the Closing Date, Husband drafted three promissory notes payable to himself and Debtor from Identity. The first note, for $648,092.45, provided for Identity to pay the principal balance to Debtor and Husband by January 10, 2018.[39] Husband testified that the note represented "the amount of the Northside mortgage, the Northside line of credit and some additional monies that were owed

---

[34] Doc. No. 58-23.
[35] Doc. No. 58-23, ¶ 11.
[36] Doc. No. 58-29. Husband testified that he received $251,000.00 at closing, but that his lien was not completely satisfied. Tr. I, p. 203.
[37] Doc. No. 58-31.
[38] Tr. I, pp. 219-21; Doc. No. 58-26.
[39] Doc. No. 58-28; Tr. I, p. 217.

to me."[40] The other two notes drafted on the Closing Date are in the amounts of $9,300.00 and $16,000.00. The copies of the notes in evidence are not signed.

On April 23, 2018, just six months after the Closing Date, Debtor advised Plaintiff by email that Identity could no longer meet its obligations as they became due, that Identity was dissolving, that Identity could not continue paying rent, and that Debtor was turning the business over to its salon manager "in the hope that [the salon manager's] new company will be able to preserve a leasehold interest" with Plaintiff.[41]

In March or April 2018, Plaintiff and the local school board in Ohio (under Ohio law, one of several taxing authorities) filed separate complaints requesting a valuation of the Property from Hamilton County, Ohio. The county ultimately determined that the Property was worth $900,000.00.[42]

On July 3, 2018, Debtor filed a petition under Chapter 7 of the Bankruptcy Code. Plaintiff timely filed the Complaint to determine the dischargeability of Debtor's obligation under her guarantee of the New Lease.

In December 2018, Plaintiff contracted to sell the Property to a third party, and in July 2019 Plaintiff sold the Property for $735,000.00.[43]

**B.    The Complaint**

Plaintiff alleges in the Complaint that Debtor schemed with Husband to induce Plaintiff to purchase the Property by representing that Identity was a profitable business that would perform its obligations under the New Lease. Plaintiff asserts that Debtor and Husband provided Plaintiff information that purported to show Identity's financial viability, and that Plaintiff relied on the

---

[40] Tr. I, p. 217.
[41] Doc. No. 58-35.
[42] Tr. II, pp. 74-75.
[43] Tr. II, p. 45.

information provided by Debtor. Plaintiff contends that, contrary to the alleged representations, Identity was actually operating at a loss, in severe debt, and could not pay the rent due under the New Lease.[44]

Debtor answered the Complaint,[45] the parties engaged in discovery, and the proceeding was tried over two days in October 2020. Debtor, Husband, and Plaintiff's representative, Mr. Feldkamp, testified at trial. In addition, the parties designated portions of the deposition testimony of Comisar and Vilardo as evidence,[46] and the Court admitted into evidence Plaintiff's exhibits 1 through 39 and Debtor's exhibits 2 and 3.[47] In December 2020, Debtor filed her *Trial Memorandum*, and Plaintiff filed its *Closing Brief*.[48]

**C.  Discussion**

To except a debt from discharge under § 523(a)(2), a plaintiff must prove all of the essential elements of the claim by a preponderance of the evidence.[49] Objections to the dischargeability of a particular debt in bankruptcy are strictly construed in favor of the debtor and against the creditor.[50]

In the Complaint, Plaintiff objects to the dischargeability of the debt under § 523(a)(2), but does not specify whether the Complaint is filed under § 523(a)(2)(A) or § 523(a)(2)(B).[51]

Under § 523(a)(2)(A), a debt is nondischargeable if it is obtained by "false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's or an insider's financial condition*."[52] Section 523(a)(2)(A) covers three types of conduct:  (1) false pretenses, which is an

---

[44] Doc. Nos. 1, 73.
[45] Doc. No. 12.
[46] Doc. No. 67.
[47] Tr. I, p. 162; Tr. II, p. 104.
[48] Doc. Nos. 72 and 73.
[49] *Grogan v. Garner*, 498 U.S. 279, 287-288, 111 S. Ct. 654, 660, 112 L. Ed. 2d 755 (1991).
[50] *In re Daniel*, 613 B.R. 374, 379 (Bankr. M.D. Fla. 2020)(citing *In re Kanewske*, 2017 WL 4381282, at *6 (Bankr. M.D. Fla. Sept. 29, 2017)).
[51] Doc. No. 1.
[52] 11 U.S.C. § 523(a)(2)(A) (emphasis added).

implied misrepresentation intended to create or foster a false impression; (2) a false representation, which is an express misrepresentation; and (3) actual fraud, which is a false or misleading representation made with the intent to induce reliance, and upon which the plaintiff detrimentally relied.[53] For a debt to be nondischargeable under § 523(a)(2)(A), the creditor's reliance must be justifiable, which involves a subjective measurement of the creditor's individual capacity and knowledge.[54]

> Under § 523(a)(2)(B), a debt is nondischargeable if it is obtained by
>
> use of a statement in writing –
>
> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive.[55]

Section 523(a)(2)(B) applies to a debtor's written statements that present a substantially untruthful picture of the debtor's financial condition by misrepresenting the type of information that would normally affect the decision to grant credit.[56]

For a debt to be nondischargeable under § 523(a)(2)(B), the creditor's reliance on the debtor's statement must be reasonable. Generally, the standard for reliance under § 523(a)(2)(B) is higher than the standard for reliance under § 523(a)(2)(A) because the "reasonable" requirement of

---

[53] *In re Osborne*, 604 B.R. 582, 597 (Bankr. M.D. Ga. 2019)(citations omitted).
[54] *In re May*, 579 B.R. 568, 583-84 (Bankr. D. Utah 2017); *In re Chaney*, 596 B.R. 385, 400 (Bankr. N.D. Ala. 2018)(quoting *In re Denise Roberts-Dude*, 597 F. App'x 615, 617 (11th Cir. 2015)(quoting *In re Vann*, 67 F.3d 277, 283 (11th Cir. 1995)).
[55] 11 U.S.C. § 523(a)(2)(B).
[56] *In re Chadha*, 598 B.R. 710, 718 (Bankr. E.D.N.Y. 2019)(citations omitted).

§ 523(a)(2)(B) places some level of responsibility on the creditor to verify the basis for the statement, which is more demanding than the "justifiable" requirement of § 523(a)(2)(A).[57]

Plaintiff contends that its debt is nondischargeable under § 523(a)(2)(A) as a debt arising from Debtor's false pretenses, false representations, or actual fraud.[58] But Debtor argues that § 523(a)(2)(A) does not apply to this proceeding because Mr. Feldkamp stated that Plaintiff relied on Identity's written financial statements, and Plaintiff therefore is held to the higher standard for nondischargeability under § 523(a)(2)(B).[59]

1.  **The Alleged Fraudulent Misrepresentations**

Plaintiff asserts that Debtor's fraudulent representations are contained in the two emails from Comisar to Vilardo.[60] In the first email, Comisar sent Vilardo the Lease and Identity's P&Ls.[61] Plaintiff contends that by authorizing Comisar to send the Lease, Debtor represented that Identity leased the Property from Debtor and Husband under a formal lease agreement that required Identity to pay $7,000.00 per month in rent plus the Property's expenses. Plaintiff also contends that by authorizing Comisar to send Identity's P&Ls to Vilardo, Debtor represented that Identity actually paid the rent and expenses under the Lease, and that Identity was a successful, profitable business with annual revenues of more than $1.8 million and annual net profits of $210,135.00 in 2014, $193,309.00 in 2015, and $117,457.00 in 2016.[62]

In the second email, Comisar responded to Plaintiff's three specific questions regarding the P&Ls and the relocation of additional equipment to the Property.[63] Plaintiff contends that Debtor, by

---

[57] *In re May*, 579 B.R. at 583.
[58] Doc. No. 73, pp. 2-4.
[59] Doc. No. 72, pp. 2, 8.
[60] Doc. No. 73, pp. 4-5, nn. 5-9.
[61] Doc. No. 58-13.
[62] Doc. No. 73, pp. 4-5.
[63] Doc. No. 58-19.

authorizing Comisar to send the responsive email, falsely represented that Identity's decreased profitability was due to the loss of stylists, that Identity's gift certificates were included in the P&Ls, and that Debtor planned to expand the services offered by Identity at the Property.[64]

2. **Section 523(a)(2)(A)**

The two emails from Comisar to Vilardo, with the attached Lease and P&Ls, constitute the totality of the representations upon which Plaintiff bases its claim under § 523(a)(2).[65] Because the two emails and the attached P&Ls relate to Identity's financial condition, they do not support a claim under § 523(a)(2)(A).

> That subparagraph [§ 523(a)(2)(A)] expressly does not apply to statements respecting a debtor's or an insider's financial condition. Statements respecting financial condition "are those that purport to present a picture of the debtor's overall financial health." Illustrative examples "include those analogous to balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities." Tax returns also fall within this category. The documents and oral representations on which the Plaintiffs base their § 523(a)(2)(A) claim concern [the company's] overall financial health. And since [the company] is an insider of the [the debtor], the documents are actionable, if at all, only under § 523(a)(2)(B). The oral statement is not actionable under either § 523(a)(2)(A) or (a)(2)(B).[66]

Profit and loss statements are written statements concerning a debtor's or an insider's financial condition and, as such, fall under the exception to discharge found in § 523(a)(2)(B), not § 523(a)(2)(A).[67]

3. **Section 523(a)(2)(B)**

Having found that Plaintiff's claim lies under § 523(a)(2)(B), the Court will consider whether the statements at issue satisfy the elements of nondischargeability under that provision. Plaintiff bears

---

[64] Doc. No. 73, p. 5.
[65] Doc. No. 73, pp. 4-5.
[66] *In re May*, 579 B.R. at 582 (citations omitted).
[67] *In re Torres*, 457 B.R. 13, 19-20 (Bankr. S.D. Iowa 2011)(citation omitted).

the burden of proving the elements of § 523(a)(2)(B) by a preponderance of the evidence.[68] To meet its burden of proof, Plaintiff must show that the statements were materially false, that Plaintiff reasonably relied on the statements, and that Debtor made the statements with the intent to induce Plaintiff's reliance.

    a.    **Material Falsity**

To prove that a written financial statement is materially false it is not enough to show that the statement is untrue. Instead, the creditor must prove that the statement "paints a substantially untruthful picture" of the debtor's or insider's financial condition, and that the statement misrepresented the type of information that would normally affect the decision at issue.[69]

Plaintiff asserts that the P&Ls portrayed Identity as a "highly profitable business" that was current on its obligations under the Lease, when in fact Identity was "hemorrhaging in losses, in default on its lease agreement and not paying rent at all." As evidence of Identity's poor financial health, Plaintiff relies primarily on (1) Debtor's tax returns reflecting operating losses for Identity in 2014, 2015, and 2016, (2) the promissory notes payable to Husband for his loans to Identity beginning in 2005, and (3) a list of Identity's liabilities as of April 11, 2018, showing vendor liabilities of $31,238.38, and long-term liabilities of more than $900,000.00.[70]

This record is sufficient to show that Identity was a financially troubled business that was propped up for years by loans from Husband. However, the only written financial information that Debtor gave to Plaintiff before the sale was the Lease and Identity's P&Ls, and the P&Ls only purported to show Identity's annual income and annual expenses—in other words its cash flow—not its total assets and total liabilities. For example, the 2016 P&L lists Identity's total income from sales

---

[68] *In re McCracken*, 586 B.R. 247, 254 (Bankr. S.D. Tex. 2018).
[69] *In re Anzo*, 547 B.R. 454, 465-66 (Bankr. N.D. Ga. 2016)(citation omitted).
[70] Doc. No. 73, pp. 5-6.

as $1,685,134.94, its "cost of goods sold" as $910,357.00, and its expenses as $657,320.70,[71] but it does not reflect Identity's liabilities for unpaid debts or accrued expenses in 2016.

Plaintiff relies upon Debtor's tax returns, Husband's promissory notes, and Identity's liabilities as of April 11, 2018, to refute the P&Ls and show that Identity was not a solvent tenant. But the documents cited by Plaintiff did not establish that the income and expenses reflected in the P&Ls were false, because the tax returns, promissory notes, and list of liabilities do not contain the same type of financial information as the P&Ls.

b. **Reasonable Reliance**

For a debt to be nondischargeable under § 523(a)(2)(B), a creditor must show by a preponderance of the evidence that the creditor actually and reasonably relied on a financial statement.[72] The reasonableness of a creditor's reliance is based on an objective standard—the standard of an ordinary and average person—and courts determine reasonableness based on the totality of the circumstances. Factors for consideration include whether the parties had a relationship of trust, whether any "red flags" arose that would have alerted an ordinarily prudent person that the statements were false, and whether a minimal investigation would have revealed the statement's falsity.

Here, Plaintiff purchased the Property that Identity leased for its business operations. As stated in its closing brief, Plaintiff bought the Property as an investment opportunity based on the Lease with Identity, which Debtor presented as a profitable salon.[73] Plaintiff's primary concern was whether Identity could perform under the Lease in the future.[74] But a statement about an act to be performed

---

[71] Doc. No. 58-13, pp. 9-10.
[72] *In re Anzo*, 547 B.R. at 467.
[73] Doc. No. 73, p. 9.
[74] See Tr. II, p. 66. Mr. Feldkamp testified that "[O]ur lessor [sic] here was Identity. So our focus was on Identity the entire time. . . . We looked at the operating income. We looked at all of their expenses. We looked at their bottom-line profits. Beyond that, I wouldn't say that we went into a deep dive on anything."

14

in the future, which is essentially a promise, is actionable only if the debtor made the statement with no intention of ever keeping the promise.[75]

Although Debtor dissolved Identity only six months after Plaintiff purchased the Property, Plaintiff did not prove that Debtor had the present intent for Identity, her business of 30 years, to terminate its lease of the Property *at the time that* Comisar sent the P&Ls to Vilardo or *at the time that* Identity entered into the New Lease with Plaintiff. In addition, before the Closing Date, Vilardo expressed concern for the risk of default given that Debtor would likely sell or transfer Identity,[76] and Mr. Feldkamp testified that he and Vilardo discussed "the fact that [Debtor] had planned to sell off her business at some point."[77] In other words, even if Identity had been a flourishing business on the Closing Date, Plaintiff was aware that there was no guarantee that it would continue to flourish in the future.

Other factors also weigh against a finding that Plaintiff's reliance on the P&Ls and emails was reasonable:

(1) Plaintiff and Debtor had no prior dealings, and there was no "relationship of trust" between the parties;[78]

(2) Plaintiff knew that Debtor was both the Property owner (the landlord) and the owner of Identity (the tenant), so that Debtor's self-dealing could be considered a "red flag" to alert Plaintiff to the need to verify the financial information;

(3) the P&Ls were prepared by Identity's internal bookkeeper, and not by an accountant or independent professional;

---

[75] *In re Moore*, 620 B.R. 617, 629 (Bankr. N.D. Ill. 2020)(citations omitted).
[76] Doc. No. 67-2, p. 71.
[77] Tr. II, p. 84.
[78] Tr. II, pp. 56-57.

15

(4) the P&Ls did not reflect Identity's gift certificates, a fact that was readily apparent from the documents and that could also be considered a red flag;

(5) Plaintiff did not request copies of Identity's tax returns, a balance sheet, or any other financial statement that would have disclosed a more accurate picture of Identity's financial condition;[79]

(6) Plaintiff did not request Debtor's personal financial information to ascertain her creditworthiness as the guarantor of the New Lease;[80] and

(7) Mr. Feldkamp never spoke directly to Debtor or Husband "during the process of evaluating the Property," instead communicating only through Plaintiff's real estate agent, Vilardo.[81]

In summary, even a minimal investigation by Plaintiff would have revealed a more complete picture of Identity's financial condition.

    c.    **Intent to Deceive**

For a debt to be nondischargeable under § 523(a)(2)(B), a creditor must show by a preponderance of the evidence that the debtor made the statement concerning its financial condition with the intent to deceive the creditor.[82] Fraudulent intent is a question of fact, and courts generally look to the totality of the circumstances to determine whether a debtor submitted a financial statement with the intent to deceive. For example, a debtor's reckless disregard for the truth of the statement, together with the magnitude of the alleged falsity, are factors that may be considered in evaluating intent. But the exception to dischargeability under § 523(a)(2)(B) is meant to apply to dishonest

---

[79] Doc. No. 67-1, Deposition transcript of Jack Vilardo, pp. 68-69.
[80] Tr. II, pp. 67-68.
[81] Tr. II, pp. 26-27, 55.
[82] *In re Anzo*, 547 B.R. at 465.

debtors, not to careless debtors, so that a debtor's recklessness in preparing a financial statement should be narrowly construed.[83]

Here, Plaintiff asserts that Debtor's fraudulent intent is evidenced by (1) the June 26, 2017 email from Husband to Comisar in which Husband discloses his lien on the Property and his interest in being paid from the sale proceeds, (2) Debtor's claimed lack of knowledge regarding Identity's financial statements, and (3) the promissory note dated as of the Closing Date, payable from Identity to Debtor and Husband.[84] Plaintiff contends that these facts show that Debtor knew that Identity was in substantial debt and would not be able to pay rent under the New Lease, and therefore evidence a premeditated scheme by Debtor to induce it to buy the Property.

The record reflects that Identity was in poor financial health before the sale and that Debtor knew that her business was in debt. However, Plaintiff, a sophisticated real estate investor, did not prove that Debtor falsely represented Identity's profitability to Plaintiff, knowing or intending for Identity to default on the New Lease. Debtor did not write the June 2017 email to Comisar, the email was not addressed to Vilardo, and the email makes no reference to any plan by Debtor to close Identity.[85] In addition, Debtor never spoke personally to Mr. Feldkamp,[86] Debtor did not personally prepare or revise the P&Ls,[87] Debtor testified that she believed that the prior promissory notes to Husband had been paid,[88] and Debtor did not provide her personal financial information to Plaintiff.[89] The Court concludes that Plaintiff did not prove that Debtor engaged in a scheme to sell the Property to Plaintiff and then to close her business shortly after the sale.

---

[83] *Id*. at 470-71.
[84] Doc. No. 73, pp. 8-9, citing Doc. Nos. 58-12, 58-28, and Tr. I., pp. 76-77.
[85] Doc. No. 58-12.
[86] Tr. II, pp. 26-27, 55.
[87] Tr. I, pp. 106, 121-22, 129; Doc. No. 72, p. 5.
[88] Tr. I, pp. 45-46, 50.
[89] Tr. II, pp. 67-68.

### D. Conclusion

Because the statements that form the basis of Plaintiff's Complaint relate to Identity's financial condition, the Court must analyze the nondischargeability of the debt under § 523(a)(2)(B). The Court has carefully considered the evidence and finds that Plaintiff did not prove by a preponderance of the evidence that Debtor made a material misrepresentation regarding Identity's financial condition, that Plaintiff reasonably relied on the misrepresentation, or that Debtor made the misrepresentation with the intent to deceive Plaintiff.

Accordingly, it is

**ORDERED:**

1. The debt owed by Debtor to Plaintiff is not excepted from discharge under 11 U.S.C. § 523(a)(2)(A) or § 523(a)(2)(B).

2. A separate Final Judgment in favor of Debtor, Linda F. Polasky, and against Plaintiff, Feldy Boys, LLC, will entered in this proceeding.

The Clerk's office is directed to serve a copy of this Order on interested parties via CM/ECF.